IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BRIAN D. ROMEY,                          CV 06-901-MA

      Plaintiff,                     OPINION AND ORDER

v.

MICHAEL J. ASTRUE,
Commissioner of Social
Security,

      Defendant.


MERRILL SCHNEIDER
Schneider Law Offices
P.O. Box 16310
Portland, OR 97292-0310
(503) 255-9092

LINDA ZISKIN
3 Monroe Parkway, Suite P, PMB#323
Lake Oswego, OR 97035
(503) 889-0472

      Attorneys for Plaintiff

1 - OPINION AND ORDER

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BRIAN D. ROMEY,                                CV 06-901-MA

      Plaintiff,                          OPINION AND ORDER

v.

MICHAEL J. ASTRUE,
Commissioner of Social
Security,

      Defendant.


MERRILL SCHNEIDER
Schneider Law Offices
P.O. Box 16310
Portland, OR 97292-0310
(503) 255-9092

LINDA ZISKIN
3 Monroe Parkway, Suite P, PMB#323
Lake Oswego, OR 97035
(503) 889-0472

      Attorneys for Plaintiff

1 - OPINION AND ORDER

KARIN J. IMMERGUT
United States Attorney
NEIL J. EVANS
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR  97204-2902
(503) 727-1053

STEPHANIE R. MARTZ
Special Assistant United States Attorney
701 Fifth Avenue, Suite 2900 MS/901
Seattle, WA  98104-7075
(206) 615-2272

        Attorneys for Defendant


MARSH, Judge.

        Plaintiff filed a civil action for judicial review of the final decision of the Commissioner denying his application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-33.  Plaintiff alleges the Administrative Law Judge (ALJ) erred in finding he is not disabled and, therefore, is not entitled to disability benefits. He seeks an order reversing the Commissioner's decision and remanding the case for a finding of disability and payment of benefits.  The Commissioner contends his decision is based on substantial evidence and is free from legal error and, therefore, requests that the court affirm his decision.

        This court has jurisdiction under 42 U.S.C. § 405(g).  For the following reasons, the court AFFIRMS the Commissioner's final decision and DISMISSES this action with prejudice.


2 - OPINION AND ORDER

KARIN J. IMMERGUT
United States Attorney
NEIL J. EVANS
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR  97204-2902
(503) 727-1053

STEPHANIE R. MARTZ
Special Assistant United States Attorney
701 Fifth Avenue, Suite 2900 MS/901
Seattle, WA  98104-7075
(206) 615-2272

       Attorneys for Defendant

MARSH, Judge.

    Plaintiff filed a civil action for judicial review of the final decision of the Commissioner denying his application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-33.  Plaintiff alleges the Administrative Law Judge (ALJ) erred in finding he is not disabled and, therefore, is not entitled to disability benefits. He seeks an order reversing the Commissioner's decision and remanding the case for a finding of disability and payment of benefits.  The Commissioner contends his decision is based on substantial evidence and is free from legal error and, therefore, requests that the court affirm his decision.

    This court has jurisdiction under 42 U.S.C. § 405(g).  For the following reasons, the court AFFIRMS the Commissioner's final decision and DISMISSES this action with prejudice.

2 - OPINION AND ORDER

## BACKGROUND

Plaintiff applied for disability benefits on February 28, 2003, claiming he was unable to work as of November 15, 1998, because of upper and lower spine injuries.[1]  His application was denied initially and on reconsideration.  He requested a hearing, which was held on November 7, 2005.  At the hearing, plaintiff testified he underwent a cervical discectomy and fusion at C5-6 in November 1998 to relieve neck pain resulting from a work injury in 1994.  The surgery did not relieve the pain and, since then, he has suffered from headaches, reduced grip strength, and sharp stabbing pains in the tips of his fingers, mainly on his right hand.  In addition, he suffers from low back pain from a subsequent accident when he fell off a swing while playing with his children.  He also suffers from depression and often thinks about killing himself.

On November 21, 2005, the ALJ issued a decision that plaintiff could perform a wide to full range of medium exertion jobs and, therefore, was not disabled.  Plaintiff appealed the denial of benefits to the Appeals Council.  On April 28, 2006, the Appeals Council affirmed the ALJ's decision and, therefore, that decision became the final decision of the Commissioner for purposes of judicial review.

---

[1] Plaintiff filed a previous application in February 2000, which was denied in October 2000.

## BACKGROUND

Plaintiff applied for disability benefits on February 28, 2003, claiming he was unable to work as of November 15, 1998, because of upper and lower spine injuries.[1]  His application was denied initially and on reconsideration.  He requested a hearing, which was held on November 7, 2005.  At the hearing, plaintiff testified he underwent a cervical discectomy and fusion at C5-6 in November 1998 to relieve neck pain resulting from a work injury in 1994.  The surgery did not relieve the pain and, since then, he has suffered from headaches, reduced grip strength, and sharp stabbing pains in the tips of his fingers, mainly on his right hand.  In addition, he suffers from low back pain from a subsequent accident when he fell off a swing while playing with his children.  He also suffers from depression and often thinks about killing himself.

On November 21, 2005, the ALJ issued a decision that plaintiff could perform a wide to full range of medium exertion jobs and, therefore, was not disabled.  Plaintiff appealed the denial of benefits to the Appeals Council.  On April 28, 2006, the Appeals Council affirmed the ALJ's decision and, therefore, that decision became the final decision of the Commissioner for purposes of judicial review.

---

[1] Plaintiff filed a previous application in February 2000, which was denied in October 2000.

3 - OPINION AND ORDER

## LEGAL STANDARDS

The initial burden of proof rests on the claimant to establish disability. <u>Roberts v. Shalala</u>, 66 F.3d 179, 182 (9th Cir. 1995), <u>cert</u>. <u>denied</u>, 517 U.S. 1122 (1996).  To meet this burden, a claimant must demonstrate the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C § 423(d)(1)(A).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1039 (9th Cir. 1995).

The court must weigh all of the evidence whether it supports or detracts from the Commissioner's decision. <u>Martinez v. Heckler</u>, 807 F.2d 771, 772 (9th Cir. 1986).  The Commissioner's decision must be upheld, however, even if the "evidence is susceptible to more than one rational interpretation." <u>Andrews</u>, 53 F.3d at 1039-40.

## LEGAL STANDARDS

The initial burden of proof rests on the claimant to establish disability.  Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996).  To meet this burden, a claimant must demonstrate the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C § 423(d)(1)(A).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).

The court must weigh all of the evidence whether it supports or detracts from the Commissioner's decision.  Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986).  The Commissioner's decision must be upheld, however, even if the "evidence is susceptible to more than one rational interpretation."  Andrews, 53 F.3d at 1039-40.

## THE ALJ'S DISABILITY ANALYSIS

The Commissioner has developed a five-step sequential inquiry to determine whether a claimant is disabled.  Bowen v. Yuckert, 482 U.S.137, 140 (1987).  See also 20 C.F.R. § 416.920. The claimant bears the burden of proof at steps one through four. See Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).  Each step is potentially dispositive.

Here, at Step One, the ALJ found plaintiff had not engaged in substantial gainful activity since the onset of his alleged disability.

At Step Two, the ALJ found plaintiff suffers from disorders of the spine and affective-depressive disorders that are severe enough to significantly limit his physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c)

At Step Three, the ALJ found plaintiff's impairments did not meet or equal any of the listed impairments considered to to be so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(iii) and (d)

The ALJ found plaintiff has the residual functional capacity to perform a "wide to full range" of work involving medium exertion, in that he is able to lift and carry up to 25 lbs frequently and 50 lbs occasionally, sit, stand, and walk, for six hours cumulatively in an eight-hour work day, with normal breaks,

## THE ALJ'S DISABILITY ANALYSIS

The Commissioner has developed a five-step sequential inquiry to determine whether a claimant is disabled. Bowen v. Yuckert, 482 U.S.137, 140 (1987). See also 20 C.F.R. § 416.920. The claimant bears the burden of proof at steps one through four. See Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999). Each step is potentially dispositive.

Here, at Step One, the ALJ found plaintiff had not engaged in substantial gainful activity since the onset of his alleged disability.

At Step Two, the ALJ found plaintiff suffers from disorders of the spine and affective-depressive disorders that are severe enough to significantly limit his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c)

At Step Three, the ALJ found plaintiff's impairments did not meet or equal any of the listed impairments considered to to be so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(iii) and (d)

The ALJ found plaintiff has the residual functional capacity to perform a "wide to full range" of work involving medium exertion, in that he is able to lift and carry up to 25 lbs frequently and 50 lbs occasionally, sit, stand, and walk, for six hours cumulatively in an eight-hour work day, with normal breaks,

5 - OPINION AND ORDER

and the unlimited capacity in his upper and lower extremities to push and pull, within the above limits.  In addition, the ALJ found plaintiff is able, occasionally, to climb stairs, ramps, ropes, ladders and scaffolding.  He should avoid constant forceful gripping with his right arm/hand.  The ALJ found plaintiff's non-exertional limitations allow him to perform no more than "simple, routine, repetitive 1-2-3 step type-work, with occasional detailed work.

At Step Four, the ALJ found plaintiff is unable to perform his past relevant work as a machinist and foundry worker.

At Step Five, however, the ALJ found plaintiff could adjust successfully to other work available in significant numbers in the regional and national economy, including the jobs of "Cleaner-Hospital", "Food Sorter", and "Mail Clerk".

Based on these findings, the ALJ found plaintiff was not under a disability.  20 C.F.R. §§ 404.1520(f).  A significant factor in the ALJ's findings was his determination that plaintiff's "reported allegations and testimony of limitations are not entirely credible."

Plaintiff challenges the disability analysis, arguing the ALJ erred when he (1) improperly rejected his testimony, (2) improperly rejected the opinions of his treating physicians, (3) inadequately assessed the extent of his impairments, and (4) inadequately assessed his residual functional capacity.

and the unlimited capacity in his upper and lower extremities to
push and pull, within the above limits.  In addition, the ALJ
found plaintiff is able, occasionally, to climb stairs, ramps,
ropes, ladders and scaffolding.  He should avoid constant
forceful gripping with his right arm/hand.  The ALJ found
plaintiff's non-exertional limitations allow him to perform no
more than "simple, routine, repetitive 1-2-3 step type-work, with
occasional detailed work.

At Step Four, the ALJ found plaintiff is unable to perform
his past relevant work as a machinist and foundry worker.

At Step Five, however, the ALJ found plaintiff could adjust
successfully to other work available in significant numbers in
the regional and national economy, including the jobs of
"Cleaner-Hospital", "Food Sorter", and "Mail Clerk".

Based on these findings, the ALJ found plaintiff was not
under a disability.  20 C.F.R. §§ 404.1520(f).  A significant
factor in the ALJ's findings was his determination that
plaintiff's "reported allegations and testimony of limitations
are not entirely credible."

Plaintiff challenges the disability analysis, arguing
the ALJ erred when he (1) improperly rejected his testimony,
(2) improperly rejected the opinions of his treating physicians,
(3) inadequately assessed the extent of his impairments, and
(4) inadequately assessed his residual functional capacity.

## THE EVIDENTIARY RECORD

1.  **Testimony.**

The ALJ conducted a hearing on November 7, 2005, at which plaintiff and Vocational Expert (VE) Susan Burkett testified. Plaintiff was represented by counsel.

    **a. Plaintiff.**

On the date of the hearing, plaintiff was 42 years old. He has a high school education and two years of college. He worked as a machinist/welder and foundry worker until November 1998, when he contends he became disabled because of neck pain caused by an on-the-job injury.

Physical Impairments.

Approximately four years after plaintiff injured his neck, he underwent neck surgery that did not relieve the pain. Plaintiff's pain level was eight and one-half on a scale of ten, which was reduced to a level of five or six with the help of prescription pain killers. Plaintiff stopped taking the medication because it upset his stomach and also because his insurance ran out. Without the prescription medication, plaintiff uses extra strength Tylenol and his pain level remains at eight and one-half to nine. He suffers from frequent headaches, which also cause the same level of pain. Plaintiff complains of decreased grip strength since his neck injury that

7 - OPINION AND ORDER

## THE EVIDENTIARY RECORD

1. **Testimony**.

The ALJ conducted a hearing on November 7, 2005, at which plaintiff and Vocational Expert (VE) Susan Burkett testified. Plaintiff was represented by counsel.

    **a. Plaintiff.**

On the date of the hearing, plaintiff was 42 years old.  He has a high school education and two years of college.  He worked as a machinist/welder and foundry worker until November 1998, when he contends he became disabled because of neck pain caused by an on-the-job injury.

Physical Impairments.

Approximately four years after plaintiff injured his neck, he underwent neck surgery that did not relieve the pain. Plaintiff's pain level was eight and one-half on a scale of ten, which was reduced to a level of five or six with the help of prescription pain killers.  Plaintiff stopped taking the medication because it upset his stomach and also because his insurance ran out.  Without the prescription medication, plaintiff uses extra strength Tylenol and his pain level remains at eight and one-half to nine.  He suffers from frequent headaches, which also cause the same level of pain.  Plaintiff complains of decreased grip strength since his neck injury that

7 - OPINION AND ORDER

causes him to drop things.  He also suffers from frequent sharp stabbing pains in the tips of his fingers on his right hand.

Plaintiff testified that about five years before the hearing, he suffered a compound fracture of his lower back after he fell 35 to 40 feet off a swing while playing with his children.

Plaintiff states he was treated at a local hospital after his fall, but his attorney has been unable to obtain medical records regarding that treatment.

Plaintiff complains that, as a result of the fall, he has stabbing pain in the area of his right kidney, shooting down his right leg, which occasionally "collapses."  Plaintiff's pain level from this injury is nine.  When plaintiff does stretching exercises and walks, the pain somewhat subsides. After his low back injury, plaintiff's ability to sit has been reduced to 15-20 minutes before he has to shift and move his leg, realigning his spine.  He can now walk a couple of blocks and stand for 15-20 minutes.  He spends much of the time lying down on his back.

Plaintiff worked "a couple of hours a day" during the summer of 2005 helping long-time friends put a new composition roof on their house.  He would remain on the roof, taking the bundles of shingles apart and using an air gun to fix them in place.

In about 2003, he stayed with his mother on her farm, and worked every day fixing fences and feeding the animals as best he

8 - OPINION AND ORDER

causes him to drop things.  He also suffers from frequent sharp stabbing pains in the tips of his fingers on his right hand.

Plaintiff testified that about five years before the hearing, he suffered a compound fracture of his lower back after he fell 35 to 40 feet off a swing while playing with his children.

Plaintiff states he was treated at a local hospital after his fall, but his attorney has been unable to obtain medical records regarding that treatment.

Plaintiff complains that, as a result of the fall, he has stabbing pain in the area of his right kidney, shooting down his right leg, which occasionally "collapses."  Plaintiff's pain level from this injury is nine.  When plaintiff does stretching exercises and walks, the pain somewhat subsides. After his low back injury, plaintiff's ability to sit has been reduced to 15-20 minutes before he has to shift and move his leg, realigning his spine.  He can now walk a couple of blocks and stand for 15-20 minutes.  He spends much of the time lying down on his back.

Plaintiff worked "a couple of hours a day" during the summer of 2005 helping long-time friends put a new composition roof on their house.  He would remain on the roof, taking the bundles of shingles apart and using an air gun to fix them in place.

In about 2003, he stayed with his mother on her farm, and worked every day fixing fences and feeding the animals as best he

8 - OPINION AND ORDER

could in light of his neck and back problems and his depression
(described below).  For a fit person, the work took an hour or
two to complete but plaintiff would spread it out over the entire
day to enable him to lie down and relax in order to ease his
pain.

Plaintiff has difficulty interacting with people and going
grocery shopping because of lack of energy and "getting over the
pain."

Psychological Impairments.

Plaintiff states that he suffers from depression, which
manifests itself in anxiety, "just not feeling in a good mood,"
lack of energy, crying, feelings of helplessness, sleeplessness
(also caused by his neck and back problems), and thoughts of
suicide.  His depression has increased in the past two years but
he no longer takes medication because his insurance ran out.

**b.  VE Burkett.**

The ALJ posed the following hypothetical to VE Burkett:
Plaintiff, based on his age, education, and past work experience,
can lift and carry 50 lbs occasionally and 20 lbs frequently,
stand, walk, and sit six hours in an eight-hour work day,
occasionally climb, and frequently perform repetitive work
without a constant forceful grip of his right hand and arm.  In
response, VE Burkett opined plaintiff could not perform his past
relevant work, but could perform work that is available in

9 - OPINION AND ORDER

could in light of his neck and back problems and his depression
(described below).  For a fit person, the work took an hour or
two to complete but plaintiff would spread it out over the entire
day to enable him to lie down and relax in order to ease his
pain.

Plaintiff has difficulty interacting with people and going
grocery shopping because of lack of energy and "getting over the
pain."

Psychological Impairments.

Plaintiff states that he suffers from depression, which
manifests itself in anxiety, "just not feeling in a good mood,"
lack of energy, crying, feelings of helplessness, sleeplessness
(also caused by his neck and back problems), and thoughts of
suicide.  His depression has increased in the past two years but
he no longer takes medication because his insurance ran out.

**b.  VE Burkett.**

The ALJ posed the following hypothetical to VE Burkett:
Plaintiff, based on his age, education, and past work experience,
can lift and carry 50 lbs occasionally and 20 lbs frequently,
stand, walk, and sit six hours in an eight-hour work day,
occasionally climb, and frequently perform repetitive work
without a constant forceful grip of his right hand and arm.  In
response, VE Burkett opined plaintiff could not perform his past
relevant work, but could perform work that is available in

9 - OPINION AND ORDER

significant numbers in the national and state economy, including medium unskilled work as a hospital cleaner and light unskilled work as a food sorter.

The VE also opined, however, that plaintiff would not be able to perform those jobs if he would miss two or more days of work each month or if his work production was decreased by 30% because of a deficiency in concentration, persistence, and pace.

## 2. **Medical Evidence.**

Plaintiff has been treated primarily for neck, back, and right arm pain, depression, and anxiety.

### a. **Plaintiff's Impairments - Treating Doctors.**

<u>1994 -1995</u>:  <u>William R. King, D.C.</u>

Dr. King treated plaintiff chiropractically for neck, upper back and left shoulder pain and stiffness, and weakness in the right arm.  In the first few weeks of his treatment, plaintiff complained of "grade 7 pain and stiffness" and was off work periodically.  Thereafter, his pain lessened to "grade 3" and he reported he was doing well at work.  In July 1995, x-rays revealed minimal degenerative disease at C-4-5-6, marked loss of cervical lordosis (inward curvature of the spine), and a functional decrease in mobility with flexion/extension between C5-6. In July 1995, Dr. King reported to plaintiff's employer that plaintiff was limited to lifting 20 lbs occasionally, with no repetitive lifting, no lifting of the right arm and shoulder,

significant numbers in the national and state economy, including medium unskilled work as a hospital cleaner and light unskilled work as a food sorter.

The VE also opined, however, that plaintiff would not be able to perform those jobs if he would miss two or more days of work each month or if his work production was decreased by 30% because of a deficiency in concentration, persistence, and pace.

2. **Medical Evidence.**

Plaintiff has been treated primarily for neck, back, and right arm pain, depression, and anxiety.

a. **Plaintiff's Impairments - Treating Doctors.**

<u>1994 -1995</u>:  <u>William R. King, D.C.</u>

Dr. King treated plaintiff chiropractically for neck, upper back and left shoulder pain and stiffness, and weakness in the right arm.  In the first few weeks of his treatment, plaintiff complained of "grade 7 pain and stiffness" and was off work periodically.  Thereafter, his pain lessened to "grade 3" and he reported he was doing well at work.  In July 1995, x-rays revealed minimal degenerative disease at C-4-5-6, marked loss of cervical lordosis (inward curvature of the spine), and a functional decrease in mobility with flexion/extension between C5-6. In July 1995, Dr. King reported to plaintiff's employer that plaintiff was limited to lifting 20 lbs occasionally, with no repetitive lifting, no lifting of the right arm and shoulder,

no activities involving frequent turning of the head and neck, and no sitting or standing for more than 30 minutes at a time.

    <u>July 1995</u>:  <u>Todd D.L. Woods, M.D. - Neurophysiologist</u>.
               <u>Ivanhoe B. Higgins, M.D.</u>

Dr. Woods examined plaintiff at Dr. King's request and found "a subtle decrease in his right triceps reflex and subtle weakness on the right triceps muscle."

Dr. Higgins examined plaintiff and noted plaintiff "would appear to have sustained a periscapular strain" and that he was improving under Dr. King's care.

    <u>1996-1999 and 2001</u>:  <u>Stephen F. Nicholson, M.D.</u>

In 1996, Dr. Nicholson began treating plaintiff for a continued complaint of cervical pain.  On initial examination, plaintiff's range of motion was reasonable and his reflexes and muscle strength were normal, but he had palpable tenderness in the trapezius and cervical spine, more so on the left side. Plaintiff could not afford medications that had been prescribed to relieve his discomfort, but he reported he was helped by doing physical therapy exercises.

In October 1998, Dr. Nicholson again treated plaintiff for pain, numbness, weakness, and tingling in his neck and right shoulder, arm, and hand.  An MRI in November 1998 revealed significant disc protrusion at C5-6 and minimal central disc profusion at C3-4 and C4-5 that "are of doubtful concern."  A second MRI in August 1999 found "some mild impression on the

11- OPINION AND ORDER

no activities involving frequent turning of the head and neck, and no sitting or standing for more than 30 minutes at a time.

July 1995:   <u>Todd D.L. Woods, M.D. - Neurophysiologist</u>.
              <u>Ivanhoe B. Higgins, M.D.</u>

Dr. Woods examined plaintiff at Dr. King's request and found "a subtle decrease in his right triceps reflex and subtle weakness on the right triceps muscle."

Dr. Higgins examined plaintiff and noted plaintiff "would appear to have sustained a periscapular strain" and that he was improving under Dr. King's care.

<u>1996-1999 and 2001</u>:   <u>Stephen F. Nicholson, M.D.</u>

In 1996, Dr. Nicholson began treating plaintiff for a continued complaint of cervical pain.  On initial examination, plaintiff's range of motion was reasonable and his reflexes and muscle strength were normal, but he had palpable tenderness in the trapezius and cervical spine, more so on the left side. Plaintiff could not afford medications that had been prescribed to relieve his discomfort, but he reported he was helped by doing physical therapy exercises.

In October 1998, Dr. Nicholson again treated plaintiff for pain, numbness, weakness, and tingling in his neck and right shoulder, arm, and hand.  An MRI in November 1998 revealed significant disc protrusion at C5-6 and minimal central disc profusion at C3-4 and C4-5 that "are of doubtful concern."  A second MRI in August 1999 found "some mild impression on the

11- OPINION AND ORDER

cervical subarachnoid space" at the C5-6 level and "mild disc protrusions at C3-4 and C4-5, which do not appear to be causing any significant impression on neural structures."

During 1998 and 1999, Dr. Nicholson also treated plaintiff for increasing anxiety and depression, noting plaintiff exhibited "overwhelming symptoms" of sadness, anxiety, stress, depression, Plaintiff described "sadness, easy tearfulness, feelings of despair, insomnia, and decreased appetite." Dr. Nicholson prescribed Paxil.

In January 2001, Dr. Nicholson saw plaintiff for a follow-up of his neck injury and stated "I am not sure why he is not yet working as far as I can tell he is medically stationary and he has no long term disability. He is advised of this."

November 1998: David C. Brett, M.D. - Neurosurgeon.

Dr. Nicholson referred plaintiff to Dr. Brett who examined him and determined that, as a result of his work injury four years earlier, plaintiff required surgery involving an anterior cervical discectomy, foraminotomy, and neural decompression followed by a fusion at C5-6. Dr. Brett thought plaintiff's prognosis after surgery was excellent. Dr. Brett advised plaintiff to remain off work and he prescribed pain medication, muscle relaxants and sleep medication.

March 1999: J. Michael Calhoun, M.D. - Neurosurgeon.

Dr. Calhoun examined plaintiff and successfully performed

12- OPINION AND ORDER

cervical subarachnoid space" at the C5-6 level and "mild disc protrusions at C3-4 and C4-5, which do not appear to be causing any significant impression on neural structures."

During 1998 and 1999, Dr. Nicholson also treated plaintiff for increasing anxiety and depression, noting plaintiff exhibited "overwhelming symptoms" of sadness, anxiety, stress, depression, Plaintiff described "sadness, easy tearfulness, feelings of despair, insomnia, and decreased appetite." Dr. Nicholson prescribed Paxil.

In January 2001, Dr. Nicholson saw plaintiff for a follow-up of his neck injury and stated "I am not sure why he is not yet working as far as I can tell he is medically stationary and he has no long term disability. He is advised of this."

November 1998: David C. Brett, M.D. - Neurosurgeon.

Dr. Nicholson referred plaintiff to Dr. Brett who examined him and determined that, as a result of his work injury four years earlier, plaintiff required surgery involving an anterior cervical discectomy, foraminotomy, and neural decompression followed by a fusion at C5-6. Dr. Brett thought plaintiff's prognosis after surgery was excellent. Dr. Brett advised plaintiff to remain off work and he prescribed pain medication, muscle relaxants and sleep medication.

March 1999: J. Michael Calhoun, M.D. - Neurosurgeon.

Dr. Calhoun examined plaintiff and successfully performed

the surgery recommended by Dr. Brett.

December 2001 - April 2003:  Eunice Lian-Leaf, M.D.

Dr. Lian-Leaf treated plaintiff for depression and
generalized anxiety on each of the five occasions she saw him.
On each of those occasions, plaintiff's mental status examination
was essentially normal although he was depressed.  In general,
his mental faculties such as thought, speech, orientation,
concentration, memory, information, vocabulary, and judgment were
"normal" and/or "good" or "fair to good."  Dr. Lian-Leaf did not
offer an opinion regarding plaintiff's ability to work in light
of his psychological impairments.

June-October 2005:  Aoi Mizushima, M.D. - Family Practice.

In June and October 2005, Dr. Mizushima treated plaintiff on
two occasions for neck pain associated with upper extremity
weakness.  She noted plaintiff "has found own non-med modalities
to deal w/ chronic pain."  She encouraged plaintiff to continue
the exercises he found helpful.

Dr. Mizushima also treated plaintiff for depression,
anxiety, insomnia, concerns of psychomotor retardation, and
decreased concentration.  She thought plaintiff might benefit
from counseling for these difficulties.

In November 2005, shortly after her second and final
examination of plaintiff, Dr. Mizushima completed a form
presented by plaintiff's attorney in support of plaintiff's

13- OPINION AND ORDER

the surgery recommended by Dr. Brett.

December 2001 - April 2003:  Eunice Lian-Leaf, M.D.

Dr. Lian-Leaf treated plaintiff for depression and generalized anxiety on each of the five occasions she saw him. On each of those occasions, plaintiff's mental status examination was essentially normal although he was depressed.  In general, his mental faculties such as thought, speech, orientation, concentration, memory, information, vocabulary, and judgment were "normal" and/or "good" or "fair to good."  Dr. Lian-Leaf did not offer an opinion regarding plaintiff's ability to work in light of his psychological impairments.

June-October 2005:  Aoi Mizushima, M.D. - Family Practice.

In June and October 2005, Dr. Mizushima treated plaintiff on two occasions for neck pain associated with upper extremity weakness.  She noted plaintiff "has found own non-med modalities to deal w/ chronic pain."  She encouraged plaintiff to continue the exercises he found helpful.

Dr. Mizushima also treated plaintiff for depression, anxiety, insomnia, concerns of psychomotor retardation, and decreased concentration.  She thought plaintiff might benefit from counseling for these difficulties.

In November 2005, shortly after her second and final examination of plaintiff, Dr. Mizushima completed a form presented by plaintiff's attorney in support of plaintiff's

disability claim.  She diagnosed chronic neck/back pain, cervical radiculopathy, pain/weakness in the right hand, as well as depression and anxiety that is "quite severe," making it difficult for plaintiff to get out of bed in the morning.  She indicated by a check mark that plaintiff's spinal disorders are evidenced by nerve root compression.

Dr. Mizushima states her review of plaintiff's chart notes over the years reveals unresolved ongoing, progressive symptoms of hand/neck pain and weakness that, according to plaintiff, is relieved only when he lies down.  Dr. Mizushima states there is no objective evidence supporting plaintiff's need to lie down periodically.  Dr. Mizushima indicates plaintiff does have evidence of nerve root compression supporting his spinal disorders.

Dr. Mizushima opines that plaintiff's physical activity is limited to the following:  Frequent lifting of less than 10 lbs; standing and walking at least two hours in an eight hour day; and sitting for a total of four hours in an eight hour day.  In addition, plaintiff should never push or pull, climb or stoop, reach in all directions, handle with gross manipulation, or finger with fine manipulation.  He may occasionally balance, kneel, crouch or crawl.  Plaintiff also should avoid frequent exposure to extreme cold, extreme heat, wetness, humidity, noise, vibration, and fumes, and avoid all exposure to machinery

14- OPINION AND ORDER

disability claim.  She diagnosed chronic neck/back pain, cervical radiculopathy, pain/weakness in the right hand, as well as depression and anxiety that is "quite severe," making it difficult for plaintiff to get out of bed in the morning.  She indicated by a check mark that plaintiff's spinal disorders are evidenced by nerve root compression.

Dr. Mizushima states her review of plaintiff's chart notes over the years reveals unresolved ongoing, progressive symptoms of hand/neck pain and weakness that, according to plaintiff, is relieved only when he lies down.  Dr. Mizushima states there is no objective evidence supporting plaintiff's need to lie down periodically.  Dr. Mizushima indicates plaintiff does have evidence of nerve root compression supporting his spinal disorders.

Dr. Mizushima opines that plaintiff's physical activity is limited to the following:  Frequent lifting of less than 10 lbs; standing and walking at least two hours in an eight hour day; and sitting for a total of four hours in an eight hour day.  In addition, plaintiff should never push or pull, climb or stoop, reach in all directions, handle with gross manipulation, or finger with fine manipulation.  He may occasionally balance, kneel, crouch or crawl.  Plaintiff also should avoid frequent exposure to extreme cold, extreme heat, wetness, humidity, noise, vibration, and fumes, and avoid all exposure to machinery

14- OPINION AND ORDER

hazards.

As to plaintiff's psychological impairments, Dr. Mizushima checked boxes indicating plaintiff suffers from every affective disorder listed, <u>i.e.</u>, anhedonia, loss of appetite, sleep disturbance, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, and thoughts of suicide, in addition to generalized persistent anxiety accompanied by motor tension, autonomic hyperactivity, apprehensive expectation, recurrent severe panic attacks, and recurrent obsessions and compulsions. Given these limitations and difficulties, Dr. Mizushima indicates plaintiff has marked restrictions in daily living activities, marked difficulties in maintaining social functioning and marked difficulties in maintaining concentration, persistence, or pace. In addition Dr. Mizushima notes plaintiff has had three extended episodes of decompensation (personality disintegration).

**b.  Plaintiff's Impairments - Examining/Consulting Doctors.**

<u>May 2003</u>:  <u>Julie Cheek, M.D. - Examining Physician</u>.

Dr. Cheek conducted a 25 minute examination of plaintiff. She did not review any medical records or MRIs.  She noted plaintiff had a normal gait, sat comfortably, and was at ease taking his shoes off.  There were no inconsistencies in the examination and his effort was satisfactory.  Dr Cheek found plaintiff has mild scoliosis to the right, with no tenderness,

hazards.

As to plaintiff's psychological impairments, Dr. Mizushima checked boxes indicating plaintiff suffers from every affective disorder listed, i.e., anhedonia, loss of appetite, sleep disturbance, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, and thoughts of suicide, in addition to generalized persistent anxiety accompanied by motor tension, autonomic hyperactivity, apprehensive expectation, recurrent severe panic attacks, and recurrent obsessions and compulsions. Given these limitations and difficulties, Dr. Mizushima indicates plaintiff has marked restrictions in daily living activities, marked difficulties in maintaining social functioning and marked difficulties in maintaining concentration, persistence, or pace. In addition Dr. Mizushima notes plaintiff has had three extended episodes of decompensation (personality disintegration).

**b. Plaintiff's Impairments - Examining/Consulting Doctors.**

May 2003: Julie Cheek, M.D. - Examining Physician.

Dr. Cheek conducted a 25 minute examination of plaintiff. She did not review any medical records or MRIs. She noted plaintiff had a normal gait, sat comfortably, and was at ease taking his shoes off. There were no inconsistencies in the examination and his effort was satisfactory. Dr Cheek found plaintiff has mild scoliosis to the right, with no tenderness,

15- OPINION AND ORDER

crepitus, effusion, deformity, or trigger points.  He has full
motor strength to the biceps, deltoid, shoulder, wrist, fingers,
knees, hips, plantar flexion, dorsiflexion, and dorsiflexion of
the great toes.  He has slightly decreased motor strength to the
triceps bilaterally, but normal muscle bulk and tone and normal
bilateral grip strength.

Dr. Cheek concluded that plaintiff was able to stand and
walk for at least six hours in an eight-hour work day, and sit
without any restrictions.

January 2004:  Martin Lahr, M.D./Mary Ann WestFall, M.D.
               DDS Consulting Physicians.

Dr. Lahr and Dr. Westfall reviewed plaintiff's medical
records  to determine his physical limitations and concluded
"medical and non-medical findings do not wholly support the level
of disability alleged by claimant."  They found plaintiff may
lift 50 lbs occasionally and 25 lbs frequently, stand, walk, or
sit with normal breaks for six hours in an eight-hour work day,
push or pull without limitation, climb occasionally, and balance,
stoop, kneel, crouch, and crawl, frequently.

December 2003:  Stephen M. Huggins, Psy.D.
                DDS Examining Psychologist.

Dr. Huggins examined plaintiff to assess the severity of his
psychological impairments.  He found plaintiff exhibits symptoms
of severe depression and moderate anxiety, which are confirmed

crepitus, effusion, deformity, or trigger points.  He has full
motor strength to the biceps, deltoid, shoulder, wrist, fingers,
knees, hips, plantar flexion, dorsiflexion, and dorsiflexion of
the great toes.  He has slightly decreased motor strength to the
triceps bilaterally, but normal muscle bulk and tone and normal
bilateral grip strength.

Dr. Cheek concluded that plaintiff was able to stand and
walk for at least six hours in an eight-hour work day, and sit
without any restrictions.

January 2004: Martin Lahr, M.D./Mary Ann WestFall, M.D.
                DDS Consulting Physicians.

Dr. Lahr and Dr. Westfall reviewed plaintiff's medical
records  to determine his physical limitations and concluded
"medical and non-medical findings do not wholly support the level
of disability alleged by claimant."  They found plaintiff may
lift 50 lbs occasionally and 25 lbs frequently, stand, walk, or
sit with normal breaks for six hours in an eight-hour work day,
push or pull without limitation, climb occasionally, and balance,
stoop, kneel, crouch, and crawl, frequently.

December 2003: Stephen M. Huggins, Psy.D.
                DDS Examining Psychologist.

Dr. Huggins examined plaintiff to assess the severity of his
psychological impairments.  He found plaintiff exhibits symptoms
of severe depression and moderate anxiety, which are confirmed

by plaintiff's "self-report" of "a history of anger problems and poor judgment in his interpersonal relationships and problem solving." Dr. Huggins opined that plaintiff's depression was "probably exacerbated by the pain he experiences secondary to his back injury" and that "numerous life problems" add to his stress.

     <u>January 2004</u>:   <u>Bill Hennings, Ph.D.</u>
                       <u>DDS Consulting Psychologist</u>.

Dr. Hennings reviewed plaintiff's records to determine his psychological limitations. He assigned plaintiff a GAF score of 50 (serious impairment in social and occupational functioning) and concluded plaintiff suffers from major depression, severe, and generalized anxiety disorder. Dr. Hennings opined that plaintiff is able to understand and carry out simple tasks on a consistent basis, and that he has mild restrictions and difficulties in activities of daily living and maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.

## **DISCUSSION**

## 1. **Rejection of Plaintiff's Testimony**.

Plaintiff alleges the ALJ provided inadequate, vague, and speculative reasons for rejecting his testimony regarding the severity of his physical and psychological impairments.

Where, as here, there is no affirmative evidence of

by plaintiff's "self-report" of "a history of anger problems and poor judgment in his interpersonal relationships and problem solving." Dr. Huggins opined that plaintiff's depression was "probably exacerbated by the pain he experiences secondary to his back injury" and that "numerous life problems" add to his stress.

<u>January 2004</u>:   <u>Bill Hennings, Ph.D.</u>
                 <u>DDS Consulting Psychologist</u>.

Dr. Hennings reviewed plaintiff's records to determine his psychological limitations. He assigned plaintiff a GAF score of 50 (serious impairment in social and occupational functioning) and concluded plaintiff suffers from major depression, severe, and generalized anxiety disorder. Dr. Hennings opined that plaintiff is able to understand and carry out simple tasks on a consistent basis, and that he has mild restrictions and difficulties in activities of daily living and maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.

## **DISCUSSION**

1. **Rejection of Plaintiff's Testimony**.

Plaintiff alleges the ALJ provided inadequate, vague, and speculative reasons for rejecting his testimony regarding the severity of his physical and psychological impairments.

Where, as here, there is no affirmative evidence of

malingering, the ALJ must state clear and convincing reasons for rejecting plaintiff's testimony regarding the severity of his symptoms. <u>Dodrill v. Shalala</u>, 12 F.3d 915, 918 (9th Cir. 1993). <u>See also Smolen</u>, 80 F.3d at 1283.  In determining the credibility of plaintiff's testimony, the ALJ may rely on (1) ordinary techniques of credibility evaluation such as his reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by plaintiff that appears less than candid; (2) an unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) plaintiff's daily activities.  <u>Id</u>. at 1284 (citations omitted).

        The ALJ found plaintiff's allegations of pain, fatigue, and physical limitations were inconsistent with his work on a roof one summer, where he used an air gun attached to a hose to nail down roof shingles, as well as his ability to work part-time while claiming to be unable to work.  The ALJ also noted plaintiff's reasons for not taking pain medications were inconsistent - on the one hand, plaintiff did not want prescription pain medication because it upset his stomach, and on the other, that he was not interested in pain medication.

        I find the ALJ's skepticism regarding the extent of plaintiff's physical impairments is well-founded in light of plaintiff's summer roofing work, and for that reason alone, the

18- OPINION AND ORDER

malingering, the ALJ must state clear and convincing reasons for rejecting plaintiff's testimony regarding the severity of his symptoms. <u>Dodrill v. Shalala</u>, 12 F.3d 915, 918 (9th Cir. 1993). <u>See also Smolen</u>, 80 F.3d at 1283.  In determining the credibility of plaintiff's testimony, the ALJ may rely on (1) ordinary techniques of credibility evaluation such as his reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by plaintiff that appears less than candid; (2) an unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) plaintiff's daily activities.  <u>Id</u>. at 1284 (citations omitted).

    The ALJ found plaintiff's allegations of pain, fatigue, and physical limitations were inconsistent with his work on a roof one summer, where he used an air gun attached to a hose to nail down roof shingles, as well as his ability to work part-time while claiming to be unable to work.  The ALJ also noted plaintiff's reasons for not taking pain medications were inconsistent - on the one hand, plaintiff did not want prescription pain medication because it upset his stomach, and on the other, that he was not interested in pain medication.

    I find the ALJ's skepticism regarding the extent of plaintiff's physical impairments is well-founded in light of plaintiff's summer roofing work, and for that reason alone, the

18- OPINION AND ORDER

ALJ was justified in finding plaintiff's testimony was not "entirely credible." For instance, plaintiff used a nail gun on the roof even though one of his major physical complaints is his lack of grip strength. Moreover, plaintiff's ability to move around on the roof by using a skate board is not consistent with his claims of severe neck and low back pain. Accordingly, I conclude the ALJ did not err in rejecting plaintiff's testimony.

2.  **Rejection of Treating Physicians' Opinions**.

    Plaintiff contends the ALJ did not give clear and convincing reasons for rejecting Dr. Mizushima's opinion as to plaintiff's exertional limitations, and the medical reports and opinions of Dr. King and Dr. Lian-Leaf. I disagree.

    "An ALJ may reject the uncontradicted medical opinion of a treating physician only for clear and convincing reasons supported by substantial evidence in the record." Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998). If a treating physician's medical opinion is supported by medically acceptable diagnostic techniques and is not inconsistent with other substantial evidence in the record, the treating physician's opinion is given controlling weight. An ALJ may reject the uncontradicted medical opinion of a treating physician only for "clear and convincing reasons supported by substantial evidence in the record." Id.

19- OPINION AND ORDER

ALJ was justified in finding plaintiff's testimony was not
"entirely credible."  For instance, plaintiff used a nail gun
on the roof even though one of his major physical complaints is
his lack of grip strength.  Moreover, plaintiff's ability to move
around on the roof by using a skate board is not consistent with
his claims of severe neck and low back pain.  Accordingly, I
conclude the ALJ did not err in rejecting plaintiff's testimony.

2.  **Rejection of Treating Physicians' Opinions**.

        Plaintiff contends the ALJ did not give clear and convincing
reasons for rejecting Dr. Mizushima's opinion as to plaintiff's
exertional limitations, and the medical reports and opinions of
Dr. King and Dr. Lian-Leaf.  I disagree.

        "An ALJ may reject the uncontradicted medical opinion of a
treating physician only for clear and convincing reasons
supported by substantial evidence in the record."  Reddick v.
Chater, 157 F.3d 715, 725 (9th Cir. 1998).  If a treating
physician's medical opinion is supported by medically acceptable
diagnostic techniques and is not inconsistent with other
substantial evidence in the record, the treating physician's
opinion is given controlling weight.  An ALJ may reject the
uncontradicted medical opinion of a treating physician only for
"clear and convincing reasons supported by substantial evidence
in the record."  Id.

Dr. Mizushima.

The ALJ notes Dr. Mizushima described plaintiff's exertional limitations on a "fill in the blank questionnaire" on which she acknowledged there was no "objective data" to support plaintiff's claim that he has to lie down frequently during the day and can no longer work with his hands on a regular basis.  Her findings were based solely on plaintiff's subjective description of his limitations.  In addition, the ALJ noted that Dr. Mizushima examined plaintiff only twice and did not treat him in any meaningful way, either by prescribing pain medications or otherwise.  She did not require plaintiff to undergo any clinical testing and her scant medical reports do not reflect that she reviewed any diagnostic studies (MRIs, X-Rays, CT-Scans).  The ALJ also points out that Dr. Mizushima's opinion regarding plaintiff's ability to work is contradicted by Dr. Nicholson, who treated plaintiff over a three year period both before and after he underwent neck surgery.  In a 2001 report, Dr. Nicholson questioned "why [plaintiff] is not yet working" because plaintiff "is medically stationary and he has no long term disability."

Based on this record, I find the ALJ gave clear and convincing reasons for rejecting Dr. Mizushima's opinion as to plaintiff's exertional limitations, particularly in so far as she based her opinions almost exclusively on plaintiff's subjective reporting, which the ALJ appropriately discredited.

20- OPINION AND ORDER

Dr. Mizushima.

The ALJ notes Dr. Mizushima described plaintiff's exertional
limitations on a "fill in the blank questionnaire" on which she
acknowledged there was no "objective data" to support plaintiff's
claim that he has to lie down frequently during the day and can
no longer work with his hands on a regular basis.  Her findings
were based solely on plaintiff's subjective description of his
limitations.  In addition, the ALJ noted that Dr. Mizushima
examined plaintiff only twice and did not treat him in any
meaningful way, either by prescribing pain medications or
otherwise.  She did not require plaintiff to undergo any clinical
testing and her scant medical reports do not reflect that she
reviewed any diagnostic studies (MRIs, X-Rays, CT-Scans).  The
ALJ also points out that Dr. Mizushima's opinion regarding
plaintiff's ability to work is contradicted by Dr. Nicholson, who
treated plaintiff over a three year period both before and after
he underwent neck surgery.  In a 2001 report, Dr. Nicholson
questioned "why [plaintiff] is not yet working" because plaintiff
"is medically stationary and he has no long term disability."

Based on this record, I find the ALJ gave clear and
convincing reasons for rejecting Dr. Mizushima's opinion as to
plaintiff's exertional limitations, particularly in so far as she
based her opinions almost exclusively on plaintiff's subjective
reporting, which the ALJ appropriately discredited.

Dr. King.

Plaintiff asserts the ALJ erred because he did not discuss Dr. King's medical reports regarding plaintiff's limitations.  I disagree.

"The Secretary need not discuss all evidence presented to [him]. Rather, [he] must explain why significant probative evidence has been rejected." Vincent ex rel. Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir. 1984), citing Cotter v. Harris, 642 F.2d 700, 706 (3d Cir. 1981).

Here, the Commissioner asserts Dr. King's reports are not probative because he treated plaintiff before the alleged onset of his disability.  I agree.  All of Dr. King's treatment occurred before plaintiff underwent the neck surgery.  In his description of his disability, plaintiff claims his neck problems first bothered him in January 1997, and he was unable to work as of October 1998.  Dr. King treated plaintiff in 1994 and 1995, after plaintiff suffered his neck injury, but before the neck surgery.  Dr. King did not treat plaintiff after his alleged disability onset date.  Although plaintiff points out that on several occasions, Dr. King occasionally wrote notes to plaintiff's employer requesting that plaintiff be excused from work because of his pain, Dr. King also reported on occasion that plaintiff was capable of doing "regular" or "light" work, and that he was "doing well at work."

21- OPINION AND ORDER

Dr. King.

Plaintiff asserts the ALJ erred because he did not discuss Dr. King's medical reports regarding plaintiff's limitations.  I disagree.

"The Secretary need not discuss all evidence presented to [him]. Rather, [he] must explain why significant probative evidence has been rejected."  Vincent ex rel. Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir. 1984), citing Cotter v. Harris, 642 F.2d 700, 706 (3d Cir. 1981).

Here, the Commissioner asserts Dr. King's reports are not probative because he treated plaintiff before the alleged onset of his disability.  I agree.  All of Dr. King's treatment occurred before plaintiff underwent the neck surgery.  In his description of his disability, plaintiff claims his neck problems first bothered him in January 1997, and he was unable to work as of October 1998.  Dr. King treated plaintiff in 1994 and 1995, after plaintiff suffered his neck injury, but before the neck surgery.  Dr. King did not treat plaintiff after his alleged disability onset date.  Although plaintiff points out that on several occasions, Dr. King occasionally wrote notes to plaintiff's employer requesting that plaintiff be excused from work because of his pain, Dr. King also reported on occasion that plaintiff was capable of doing "regular" or "light" work, and that he was "doing well at work."

21- OPINION AND ORDER

On this record, I find Dr. King's reports, which predate plaintiff's neck surgery and his alleged disability onset date, are not probative and the ALJ did not err in failing to discuss them.

Dr. Lian-Leaf.

Plaintiff also argues the ALJ erred by ignoring Dr. Lian-Leaf's treatment of plaintiff's depression and anxiety disorder. The ALJ found that plaintiff did not seek or undergo "mental health treatment, counseling or medication management for mental health reasons." As noted above, however, Dr. Lian-Leaf saw plaintiff on five occasions over a 15-month period from 2001-2003 for his depression and anxiety. During that time, plaintiff did not follow-up on Dr. Lian-Leaf's recommendation that he seek counseling at Clackamas County Mental Health, and although he was prescribed anti-depressant medication towards the end of his treatment, plaintiff stopped taking the medication on his own initiative.

On this record, I find the ALJ did not err in failing to discuss Dr. Lian-Leaf's treatment of plaintiff because the treatment records do not offer insight into the severity of plaintiff's depression and anxiety disorder. Even if the records have some probative value, the ALJ's failure to discuss them was harmless error. Abela v. Secretary of Health & Human Services, 960 F.2d 152 (9th Cir. 1992).

22- OPINION AND ORDER

On this record, I find Dr. King's reports, which predate plaintiff's neck surgery and his alleged disability onset date, are not probative and the ALJ did not err in failing to discuss them.

Dr. Lian-Leaf.

Plaintiff also argues the ALJ erred by ignoring Dr. Lian-Leaf's treatment of plaintiff's depression and anxiety disorder. The ALJ found that plaintiff did not seek or undergo "mental health treatment, counseling or medication management for mental health reasons." As noted above, however, Dr. Lian-Leaf saw plaintiff on five occasions over a 15-month period from 2001-2003 for his depression and anxiety. During that time, plaintiff did not follow-up on Dr. Lian-Leaf's recommendation that he seek counseling at Clackamas County Mental Health, and although he was prescribed anti-depressant medication towards the end of his treatment, plaintiff stopped taking the medication on his own initiative.

On this record, I find the ALJ did not err in failing to discuss Dr. Lian-Leaf's treatment of plaintiff because the treatment records do not offer insight into the severity of plaintiff's depression and anxiety disorder. Even if the records have some probative value, the ALJ's failure to discuss them was harmless error. Abela v. Secretary of Health & Human Services, 960 F.2d 152 (9th Cir. 1992).

22- OPINION AND ORDER

3.   **Inadequate Analysis of Plaintiff's Impairments**.

Plaintiff contends the ALJ did not adequately consider and make severity findings regarding plaintiff's anxiety disorder, lower back pain, right arm pain and weakness, and headaches.  He contends he testified to the severity of all of these impairments and he cites to numerous pages in the record that purport to support his complaints.  Plaintiff also contends the ALJ failed to consider adequately all of his impairments, either singly or in combination, to determine whether they met or equaled a Listed Impairment.

The Commissioner asserts that, with the exception of plaintiff's anxiety disorder and right arm pain and weakness, there is no evidence in the record other than plaintiff's subjective complaints to support the existence or severity of the other conditions.  Furthermore, he asserts the ALJ adequately addressed whether plaintiff's impairments met or equaled Listed Impairments, either singly or in combination.

Anxiety Disorder.

As to plaintiff's anxiety disorder, the record as a whole reflects the ALJ considered it to be severe although his Step Two Finding referred only to a severe depressive disorder.  The ALJ should have identified plaintiff's anxiety disorder as severe at Step Two, but his failure to do so is harmless error because

23- OPINION AND ORDER

3.   **Inadequate Analysis of Plaintiff's Impairments**.

Plaintiff contends the ALJ did not adequately consider and make severity findings regarding plaintiff's anxiety disorder, lower back pain, right arm pain and weakness, and headaches.  He contends he testified to the severity of all of these impairments and he cites to numerous pages in the record that purport to support his complaints.  Plaintiff also contends the ALJ failed to consider adequately all of his impairments, either singly or in combination, to determine whether they met or equaled a Listed Impairment.

The Commissioner asserts that, with the exception of plaintiff's anxiety disorder and right arm pain and weakness, there is no evidence in the record other than plaintiff's subjective complaints to support the existence or severity of the other conditions.  Furthermore, he asserts the ALJ adequately addressed whether plaintiff's impairments met or equaled Listed Impairments, either singly or in combination.

Anxiety Disorder.

As to plaintiff's anxiety disorder, the record as a whole reflects the ALJ considered it to be severe although his Step Two Finding referred only to a severe depressive disorder.  The ALJ should have identified plaintiff's anxiety disorder as severe at Step Two, but his failure to do so is harmless error because

23- OPINION AND ORDER

it was considered severe by Dr. Hennings, the consulting
psychologist who assessed plaintiff's psychological limitations
for purposes of determining his residual functional capacity.
Burch v. Barnhart, 400 F.3d 676, 682-683 (9th Cir. 2005).

<u>Right Arm Pain and Weakness</u>

The record reflects the ALJ considered plaintiff's right arm
pain and weakness within the confines of plaintiff's cervical
complaints and, therefore, this impairment was appropriately
accounted for in the determination of plaintiff's residual
functional capacity.

<u>Lower Back Pain and Headaches</u>.

As to these alleged physical impairments, Plaintiff's
numerous citations to the medical record do not avail him because
there is nothing in that record identifying objective findings
relevant to these conditions.  Indeed, the extent and severity of
these impairments are evidenced only by plaintiff's subjective
complaints, which the ALJ properly found to be not "entirely
credible."

<u>Listed Impairments</u>.

Contrary to plaintiff's contention, the ALJ specifically
identified the relevant Listed Impairments, <u>i.e.</u>, disorders of
the spine (1.04), affective-depressive disorders (12.04), and
anxiety-related disorders (12.06), and found plaintiff's

it was considered severe by Dr. Hennings, the consulting
psychologist who assessed plaintiff's psychological limitations
for purposes of determining his residual functional capacity.
Burch v. Barnhart, 400 F.3d 676, 682-683 (9th Cir. 2005).

Right Arm Pain and Weakness

The record reflects the ALJ considered plaintiff's right arm
pain and weakness within the confines of plaintiff's cervical
complaints and, therefore, this impairment was appropriately
accounted for in the determination of plaintiff's residual
functional capacity.

Lower Back Pain and Headaches.

As to these alleged physical impairments, Plaintiff's
numerous citations to the medical record do not avail him because
there is nothing in that record identifying objective findings
relevant to these conditions.  Indeed, the extent and severity of
these impairments are evidenced only by plaintiff's subjective
complaints, which the ALJ properly found to be not "entirely
credible."

Listed Impairments.

Contrary to plaintiff's contention, the ALJ specifically
identified the relevant Listed Impairments, i.e., disorders of
the spine (1.04), affective-depressive disorders (12.04), and
anxiety-related disorders (12.06), and found plaintiff's

impairments did not meet or medically equal any one of them, when considered either singly or in combination.  This finding is supported by substantial evidence in the record as a whole, as more particularly set forth in the above evidentiary record.

Accordingly, on this record, I find the ALJ properly analysed each of plaintiff's impairments to determine their severity, and properly analyzed whether these impairments, when considered singly and in combination, met or equaled a Listed Impairment.

**4.    <u>Inadequate Assessment of Residual Functional Capacity</u>.**

Plaintiff argues that if the ALJ credited Dr. Mizushima's medical opinion regarding plaintiff's limitations, the Residual Functional Capacity assessment would have been more limited. This argument is moot in light of my conclusion that the ALJ gave clear and convincing reasons supporting his rejection of Dr. Mizushima's opinion as to plaintiff's limitations.

Finally, plaintiff argues Dr. Henning's GAF score of 50 indicates he is disabled.  I disagree.  The record reflects Dr. Hennings factored the GAF score into his determination that plaintiff suffered from major depression, severe, and generalized anxiety disorder, and accounted for those conditions in his assessment of plaintiff's residual functional capacity.

impairments did not meet or medically equal any one of them, when considered either singly or in combination.  This finding is supported by substantial evidence in the record as a whole, as more particularly set forth in the above evidentiary record.

Accordingly, on this record, I find the ALJ properly analysed each of plaintiff's impairments to determine their severity, and properly analyzed whether these impairments, when considered singly and in combination, met or equaled a Listed Impairment.

## 4.    **Inadequate Assessment of Residual Functional Capacity**.

Plaintiff argues that if the ALJ credited Dr. Mizushima's medical opinion regarding plaintiff's limitations, the Residual Functional Capacity assessment would have been more limited. This argument is moot in light of my conclusion that the ALJ gave clear and convincing reasons supporting his rejection of Dr. Mizushima's opinion as to plaintiff's limitations.

Finally, plaintiff argues Dr. Henning's GAF score of 50 indicates he is disabled.  I disagree.  The record reflects Dr. Hennings factored the GAF score into his determination that plaintiff suffered from major depression, severe, and generalized anxiety disorder, and accounted for those conditions in his assessment of plaintiff's residual functional capacity.

## CONCLUSION

For all these reasons, the final decision of the Commissioner is affirmed and this case is dismissed.

IT IS SO ORDERED.

DATED this 24 day of April, 2007.


/s/  Malcolm F. Marsh
MALCOLM F. MARSH
United States District Judge

26- OPINION AND ORDER

**CONCLUSION**

For all these reasons, the final decision of the Commissioner is affirmed and this case is dismissed.

IT IS SO ORDERED.

DATED this 24 day of April, 2007.


   /s/  Malcolm F. Marsh
MALCOLM F. MARSH
United States District Judge

26- OPINION AND ORDER